**LITE DEPALMA GREENBERG & RIVAS, LLC**
Joseph J. DePalma (JD-7697)
Katrina Blumenkrants (KB-9620)
Two Gateway Center, 12th Floor
Newark, New Jersey 07102
(973) 623-3000

**RECEIVED**

MAR 2 5 2004

AT 8:30_____M
WILLIAM T. WALSH
CLERK

Attorneys for Plaintiff
[Additional counsel on signature page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| GORDON LANCASTER, Individually and on behalf of all others similarly situated, ) ) ) | Civil Action No. 04- 1398 (JWB) |
| Plaintiff, ) ) | **CLASS ACTION COMPLAINT** |
| v. ) ) | **FOR VIOLATION OF ERISA** |
| ROYAL DUTCH PETROLEUM COMPANY, ) JEROEN VAN DER VEER, PHILIP WATTS, ) and PERVIS THOMAS, JR. ) ) | **JURY TRIAL DEMANDED** |
| Defendants. ) | |

Plaintiff Gordon Lancaster, residing at 101 Bell Flower Drive, Sunset South

Carolina 29685, individually and on behalf of all other persons similarly situated (the

"Participants"), and on behalf of the Shell Provident Fund (the "Plan"), by his attorneys, alleges

the following for his Complaint:

### NATURE OF THE ACTION

1.      Plaintiff, who is a Participant in the Plan, brings this action for Plan-wide relief on

behalf of the Plan, and on behalf of a class of all Participants in the Plan for whose individual

accounts held shares of Royal Dutch Petroleum Company (hereinafter referred to as "Royal

Dutch," "Royal Dutch/Shell" or the "Company") (NYSE: RD) as part of the Royal Dutch Stock

Fund investment option (the "Class") between December 3, 1999 and January 9, 2004, inclusive (the "Class Period"). Excluded from the Class are defendants herein, directors of Royal Dutch, their subsidiaries, members of their immediate families, and the heirs, successors or assigns of any of the foregoing. Defendants are the named fiduciaries of the Plan and several others who are deemed "fiduciaries" under the broad definition of fiduciary under section 3(21)(A) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1002(21)(A). Plaintiff brings this action on behalf of the Plan and the Class pursuant to ERISA § 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2)and (3).

2.     As more fully set forth below, Defendants breached their fiduciary duties to the Plan and the Participants, including those fiduciary duties set forth in ERISA § 404, 29 U.S.C. § 1104, and Department of Labor ("DOL") Regulations, 29 C.F.R. 2550. Defendants breached their fiduciary duties to the Plan and the Participants in two principal ways: (a) negligently misrepresenting and negligently failing to disclose material facts to the Plan and the Participants in connection with the management of the Plan's assets and (b) negligently permitting the Plan to purchase and hold Royal Dutch stock when it was imprudent to do so. As a result of these wrongful acts, pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a), defendants are personally liable to make good to the Plan the losses resulting from each such breach of fiduciary duty. Plaintiff also seeks equitable relief.

3.     Plaintiff alleges that the defendants breached their fiduciary duties by negligently misrepresenting and negligently failing to disclose material information necessary for Participants to make informed decisions concerning Plan assets and benefits and the appropriateness of the Plan investment in Royal Dutch stock, including, but not limited to, the

2

facts that: (a) Royal Dutch substantially overstated oil and gas reserves and permitted other accounting irregularities arising out of its joint partnership with Shell Transport and Trading Company, PLC ("Shell Transport") from a project off the western coast of Australia called the Gorgon Joint Venture, and various projects in Nigeria; (b) Royal Dutch classified and reported, in Securities and Exchange Commission ("SEC") filings and other public documents, certain reserves as "proved reserves" when, unbeknownst to Plan Participants, the reserves did not meet SEC and industry requirements necessary to be classified as "proved," and were improperly reported as proved reserves in Royal Dutch's financial reports, thereby materially artificially inflating a key measure of the companies' financial position and competitive standing; and (c) Royal Dutch was forced to write-down its proved oil and gas reserves by 20%, or 3.9 billion barrels, from 19.5 billion barrels to 15.6 billion barrels.

4.    Following the write-down, Royal Dutch's shares dropped 7.10% on the NYSE. In addition, Moody's placed the AAA rating of Royal Dutch under review for possible downgrade because the write-down materially and adversely affected the company's reserves-to-debt ratio. In fact, following the belated disclosure, most analysts and commentators concluded that, because of the magnitude of the write-down and the clear SEC and industry guidelines relating to reserve classification, the reserve overstatements could not have been a result of error or accident, but rather, that the reserves were knowingly overstated to preserve the company's credit rating and to shore up their competitive position.

5.    On March 8, 2004, The Wall Street Journal reported that the former Chairman of the Company, Philip Watts, was warned of possible overstatements in the Company's petroleum reserves approximately two years before he publicly disclosed them.

6.     Then, on March 9, 2004, <u>The New York Times</u> reported that, in addition to previously undisclosed knowledge of for Chairman Philip Watts, the Company's current Chairman, Van der Veer and its current chief financial officer, Judy Boynton, were also "advised of huge shortfalls in proven oil and natural gas reserves in 2002, two years before they were publicly disclosed."

7.     <u>The New York Times</u> further revealed that rather than disclose the known problems to investors in 2002, the defendants instead created and carried out what a July 2002 memorandum describes as an "external storyline" and "investor relations script" that attempted to "highlight major projects fueling growth," and "stress[ed] the strength" of existing resources -- minimizing "the significance of reserves as a measure of growth."

## JURISDICTION AND VENUE

8.     Plaintiff's claims arise under and pursuant to ERISA § 502, 29 U.S.C. § 1132.

9.     This Court has jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

10.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because this is the district where the where the breaches took place, where one or more defendants reside or may be found, or where the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred.

11.     Pursuant to 28 U.S.C. §1391(d), as an alien corporation, defendants may properly be sued in any District in the United States, including the District of New Jersey.  Thus, venue is proper in this District.

4

12.     In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

13.     Plaintiff Gordon Lancaster is a resident of the State of South Carolina and is and was at all relevant times a Participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

14.     Defendant Royal Dutch is a Netherlands corporation with its principal executive office located at 30 Carel van Bylandtlaan, 2596 HR The Hague, The Netherlands.  Royal Dutch is a 60% owner of Shell Petroleum Netherlands and Shell Petroleum UK.

15.     Defendant Jeroen Van der Veer ("Van der Veer") is the current Chairman of the Company and was, at all relevant times, the President, a Managing Director and a Group Managing Director of the Company. Previously, Van der Veer served in various capacities at the Company in refinery process design, refining and marketing, as Area Coordinator Sub-Saharan Africa, as Managing Director of Shell Nederland, and as President and Chief Executive Officer of Shell Chemical Company in the USA. Additionally, Van der Veer serves or served as a member of the Supervisory Board of De Nederlandsche Bank, and as an Advisory Director to Unilever. As Chairman of the Company, Van der Veer had the ability to direct the action to be taken with respect to the Plan.

16.     Defendant Philip Watts ("Watts"), who was ousted from his post as Chairman on March 3, 2004, was, at all relevant times, Chairman as well as a Director and Managing Director

5

of the Company. Previously, Watts served as Chief Executive Officer of Exploration and Production of the Company and, in that capacity, led the Royal Dutch's oil and gas exploration responsible for booking the Company's petroleum reserves. As the former Chairman of the Company, Watts had the ability to direct the action to be taken with respect to the Plan.

17.     During the Class Period, defendants Van der Veer and Watts, as administrators, senior executive officers and/or directors of Royal Dutch, were privy to non-public information concerning its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, Van der Veer and Watts were negligent in misrepresenting and/or failing to disclose material information to Plan Participants.

18.     Defendant Pervis Thomas, Jr. ("Thomas") is the Chief Information Officer of the Company. Thomas is designated by Shell Provident Fund as the Administrator of the Plan. Because of his affiliation with Royal Dutch and his access to internal Company reports and memoranda, and his experience with Company accounting practices, Thomas knew or should have known (1) that Royal Dutch had negligently made the materially false or misleading public statements and negligently failed to disclose material information as alleged below and (2) that purchase of Royal Dutch stock was an imprudent investment as alleged below.

## CLASS ACTION ALLEGATIONS

19.     Plaintiff brings this action in part as a class action pursuant to Rules 23(a) and (b)(1) and (3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all

Participants in the Plan for whose individual accounts the Plan purchased and/or held shares of Royal Dutch stock during the Class Period (i.e., between December 3, 1999 and January 9, 2004, both dates inclusive). Excluded from the Class are Defendants herein, directors of Royal Dutch, members of their immediate families, and the heirs, successors or assigns of any of the foregoing.

20.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes there are, at a minimum, thousands of members of the Class in that Royal Dutch's public statements represent that it had tens of thousands of employees in the United States during the Class Period, and a substantial number of these employees were Participants in the Plan for whose account the Plan held Royal Dutch securities.

21.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

        a.     whether defendants were fiduciaries of the Plan and/or the Participants;

        b.     whether defendants breached their fiduciary duties;

        c.     whether the Plan and the Participants were injured by such breaches; and

        d.     whether the Class is entitled to damages and injunctive relief.

22.     Plaintiff's claims are typical of the claims of the members of the Class, as plaintiff and members of the Class sustained injury arising out of Defendants' wrongful conduct in breaching their fiduciary duties and violating ERISA as complained of herein.

23.     Plaintiff will fairly and adequately protect the interests of the members of the

Class. Plaintiff has retained competent counsel. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

24.     Prosecution of separate actions by members of the Class would create a risk of inconsistent adjudications with respect to individual members of the class which would establish incompatible standards of conduct for defendants, or adjudications with respect to individual members of the class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

25.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the injury suffered by the individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## DESCRIPTION OF THE PLAN

26.     The Plan is an employee benefit Plan within the meaning of ERISA §§ 3(3) and 3(2)(A), 29 U.S.C. §§ 1002(3) and 1002(2)(A).

27.     The Plan is a "defined contribution" or "individual account" Plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each Participant and for benefits based solely upon the amount contributed to the Participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which may be allocated to such Participant's accounts.

Consequently, retirement benefits provided by the Plan is based solely on the amounts allocated to each individual's account.

28.    The Plan is a "401(k)" voluntary contribution Plan whereby Participants direct the Plan to purchase investments from among the investment options available in the Plan and allocate them to Participants' individual accounts.

29.    The Plan provides several options for investment of Participant contributions including the Royal Dutch Stock Fund.

30.    Royal Dutch is the Sponsor of the Plan within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B).

## DEFENDANTS WERE FIDUCIARIES OF THE PLAN

31.    Defendant Thomas is designated by the Shell Provident Fund the Administrator of the Plan within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A), because he was so designated on the Plan's Form 5500 as filed with the DOL and Forms 11-K filed with the SEC. Thomas is the "Named Fiduciary" under ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). Moreover, to the extent that Thomas was delegated responsibilities under the Plan or a procedure specified in the Plan, he acted as named fiduciary under ERISA § 402(a)(2), 29 U.S.C. § 1102(a)(2).

32.    Thomas was also a fiduciary because he exercised discretionary authority to establish investment options under the Plan, including the Royal Dutch Stock Fund.  In particular, Thomas had the duty to review Plan investment policies and alternatives and the selection and performance of those alternatives, and had the discretion to establish, change and terminate investment options under the Plan.

33.    Thomas was also a fiduciary because he had the duty to investigate fully the

investment options under the Plan, and to elicit from Royal Dutch information necessary for the proper administration of the Plan sufficient to permit Participants to make proper investment decisions with respect to the investment options.

34.     Royal Dutch was also a fiduciary because it disseminated to Participants Summary Plan Descriptions (individually and collectively, "SPD"). Fiduciaries of the Plan are required under ERISA to furnish certain information to Participants. For example, ERISA § 101, 29 U.S.C. § 1021, requires the Plan's Administrator to furnish to Participants the SPD. ERISA § 102, 29 U.S.C.§ 1022, provides that the SPD must apprise Participants of their rights and obligations under the Plan. The SPD and all information contained or incorporated therein constitute representations in a fiduciary capacity upon which Participants are entitled to rely in determining the identity and responsibilities of fiduciaries under the Plan and in making decisions concerning their benefits and investment and management of the Plan's assets allocated to their accounts.

35.     Royal Dutch  was also a fiduciary in that it disseminated to Participants prospectuses for the Plan ("Prospectus") which purported to describe the investment characteristics of Plan investment options. The Prospectus and all information contained or incorporated therein constitute
a representation in a fiduciary capacity upon which Participants are entitled to rely in making decisions concerning their benefits and investment and management of Plan assets allocated to their accounts.

36.     As more fully alleged below, Van der Veer and Watts were de facto fiduciaries of the Plan as a result of their discretionary authority or control over the Plan under the very broad

definition of "fiduciary" set forth in ERISA at § 3(21)(A), 29 U.S.C. § 1002(21)(A). A person or

entity is a fiduciary even if the Plan does not name him as such or by its terms assign fiduciary

duties to him where, by his conduct, he engages in fiduciary activities. Those who have

discretion over management of the Plan or the Plan's assets are fiduciaries regardless of the

labels or duties assigned to them by the language of the Plan. Moreover, in order to fulfill the

express remedial purpose of ERISA, the definition of "fiduciary" is to be construed broadly.

37.     Van der Veer and Watts were also fiduciaries because of direct representations to

Participants relating specifically to Plan investment options. For example, Watts was acting as a

fiduciary with respect to the direct representations he made to Plan Participants among others,

intentionally and explicitly withholding and/or spinning information regarding the Company's

petroleum reserves.

## DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES

38.     Pursuant to ERISA § 404, fiduciaries have a duty to discharge their duties with

respect to the Plan prudently and solely in the interests of Participants and Beneficiaries and for

the exclusive purpose of providing benefits to Participants and their Beneficiaries. A fiduciary's

duties of loyalty and prudence also entail a duty to conduct an independent investigation into, and

to continually monitor, the merits of the investment alternatives in the Plan, including employer

securities, to ensure that each investment is a suitable and proper option for the Plan. The

selection, monitoring and continuation of the investment alternatives under the Plan were subject

to the above-described fiduciary duties.

39.     Pursuant to ERISA § 404(a), 29 U.S.C. § 1104(a), the Plan's fiduciaries had a

duty to discharge their duties with respect to the Plan with the care, skill, prudence and diligence

11

under the circumstances then prevailing that a prudent man acting in like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and of like aims, and to diversify investment in the Plan so as to minimize the risk of large losses.

40.     Pursuant to ERISA § 409(a), 29 U.S.C. § 110(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable to make good to the Plan any losses to the Plan resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

41.     Companies typically provide two types of pension plans: (a) a "defined benefit" plan, where the amount of an employee's retirement benefit is a direct obligation of the company which is a set amount (typically based on salary while employed and number of years of employment); and (b) a "defined contribution" plan, such as a 401(k) plan, where the retirement benefit is based solely on the amount invested and the earnings made in an employee's plan account.  Fiduciaries of defined benefit plans, who invest or actively supervise the investment of plan assets, are liable under ERISA for imprudent investments made by the plan, and they are liable for and must make good to the plan any losses suffered by the plan and any loss of benefits suffered by beneficiaries as a result of imprudent investments.  Fiduciaries of defined contribution plans are similarly liable under ERISA § 404(a), 29 U.S.C. § 1104(a), for imprudent investments made by a plan, even where the investment choice is selected by the participant, unless the plan and the fiduciaries comply with the strict requirements of ERISA § 404(c), 29 U.S.C. § 1104(c).  Where the plan and fiduciaries do not comply with section 404(c), then the fiduciaries' liability for imprudent investments is the same as the liability of a fiduciary of a traditional pension plan.

12

42.   Fiduciaries can shift liability for imprudent investments to fiduciaries under Section 404c if, among other things, they meet four specific requirements:

(a)   they disclose in advance the intent to shift liability to Participants;

b)   they ensure that Participants are not subject to undue influence;

c)   they provide an adequate description of the investment objectives and risk and return characteristics of each investment option; and

d)   they disclose to Participants all material information necessary for Participants to make investment decisions that they are not precluded from disclosing under other applicable law.  In this regard, fiduciaries have a choice – they can disclose all material information to Participants, including information that they are not required to disclose under the securities laws, and shift liability to Participants, or they can comply with the more limited disclosure requirement under the securities laws but remain liable for imprudent investments. 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(i) and (ii) and (c)(2)(i) and (ii).

43.   Defendants failed to shift liability to Participants for imprudent investment decisions under section 404(c) for three reasons as alleged in Claim I below; (i) they failed to disclose in a fiduciary capacity all material information that they were not precluded from disclosing under other applicable law and which was necessary for Participants to make informed investment decisions; (ii) they failed to provide an adequate description of the investment objectives and risk and return characteristics of the Funds; and (iii) they failed to ensure that Participants were not subject to undue influence, and indeed themselves subjected Participants to

13

undue influence.

## SUBSTANTIVE ALLEGATIONS

### Background of Royal Dutch

44.     Royal Dutch is a holding company that, in conjunction Shell Transport & Trading Company, PLC,  owns, directly or indirectly, investments in the companies constituting the Royal Dutch/Shell Group of Companies (collectively the "Group"). The Company is engaged in the business of producing, refining, storing, transporting, supplying and distributing petroleum and petroleum products. The operating companies of the Group are engaged in various activities related to oil and natural gas, chemicals, power generation, renewable resources and other businesses in over 135 countries.

45.     Present in more than 145 countries and territories worldwide, the Group is engaged in the business of exploration and production of gas and power, oil products, chemicals and renewables, as well as other activities. There are two group holding companies: Shell Petroleum N.V. in the Netherlands and The Shell Petroleum Company Limited in the United Kingdom (the Group Holding Companies). The Group Holding Companies, between them, hold all the shares in Royal Dutch's service companies, and, directly or indirectly, all Company interests in its operating companies.

46.     Royal Dutch is entitled to have its nominees elected as a majority of, and Shell Transport is entitled to have its nominees elected as the balance of, the members of the Boards of Directors of the two Group Holding Companies. Every member of the Board of Management of Royal Dutch and every Managing Director of Shell Transport is also a member of the Presidium of

14

the Board of Directors of Shell Petroleum N.V. and a Managing Director of The Shell Petroleum Company Limited. As such, they are generally known as "Group Managing Directors". They are also appointed by the Boards of Shell Petroleum N.V. and The Shell Petroleum Company Limited to a joint committee known as the Committee of Managing Directors, which considers and develops objectives and long-term plans.

<h2 style="text-align:center"><u>CLAIM I</u></h2>

<b><u>DEFENDANTS NEGLIGENTLY MISREPRESENTED AND NEGLIGENTLY FAILED TO DISCLOSE MATERIAL INFORMATION</u></b>

47.    The allegations of all of the paragraphs set forth above are specifically realleged and incorporated herein by reference.

48.    Pursuant to ERISA § 404, 29 U.S.C. § 1104, defendants have a duty to discharge their duties with respect to the Plan prudently and solely in the interests of Participants and Beneficiaries and for the exclusive purpose of providing benefits to Participants and their Beneficiaries. The duty of the fiduciary includes at least:

(a)    a duty not to misinform;

(b)    a duty to inform when the fiduciary knows or should know that silence might be harmful; and

(c)    a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

49.    In the petroleum industry, there are two key measures of a company's operating performance and future prospects. Those two key measures are reported reserves and future discounted cash flows. During the Class Period, Royal Dutch's reporting of reported reserves

and future discounted cash flows was materially false and misleading.  By reporting materially false and misleading reported reserves and future discounted cash flows, Royal Dutch was able to inflate its stock price, maintain its credit rating, and maintain its status in the petroleum industry as a leader.

**Royal Dutch's SEC Form 20-F**
**For the Fiscal Year Ended December 31, 1998**

50.    The Class Period commences on December 3, 1999.  At that time, Royal Dutch filed with the SEC an annual report on Form 20-F.  With respect reported reserves, the Company stated:

Critical Accounting Policies

**In order to prepare the Financial Statements in conformity with generally accepted accounting principles in the Netherlands and the USA, management has to make estimates and assumptions.** The matters described below are considered to be the most critical in understanding the judgments that are involved in preparing the Financial Statements and the uncertainties that could impact the amounts reported on the results of operations, financial condition and cash flows. Accounting policies are described in Note 2 to the Financial Statements.

Estimation of oil and gas reserves

**Oil and gas reserves have been estimated in accordance with industry standards and SEC regulations. Proved oil and gas reserves are the estimated quantities of crude oil, natural gas and natural gas liquids that geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing economic and operating conditions. These estimates do not include probable or possible reserves. Estimates of oil and gas reserves are inherently imprecise and represent only approximate amounts and are subject to future revision, as they are based on available reservoir data, prices and costs as of the date the estimate is made. Accordingly, the financial measures that are based on proved reserves are also subject to change.** (Emphasis added).

51.    Additionally and with respect to reported reserves, Royal Dutch stated:

16

Supplementary Information — Oil and Gas Reserves

**Proved reserves are the estimated quantities of oil and gas which geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing economic and operating conditions. Proved developed reserves are those reserves which can be expected to be recovered through existing wells with existing equipment and operating methods. The reserves reported exclude volumes attributable to oil and gas discoveries which are not at present considered proved. Such reserves will be included when technical, fiscal and other conditions allow them to be economically developed and produced.**

**Proved reserves are shown net of any quantities of crude oil or natural gas that are expected to be taken by others as royalties in kind but do not exclude certain quantities related to royalties expected to be paid in cash or those related to fixed margin contracts. Proved reserves include certain quantities of crude oil or natural gas which will be produced under arrangements which involve Group companies in upstream risks and rewards but do not transfer title of the product to those companies. (Emphasis added).**

52.     With respect to future cash flows related to proved oil and gas reserve quantities, a key measure of prospective operating performance based in substantial part on proved oil and gas reserves, the Company's Form 20-F stated:

> The carrying amounts of fixed assets are reviewed for possible impairment whenever events or changes in circumstances indicate that the carrying amounts of those assets are written down to fair value. For this purpose, assets are grouped based on separately identifiable and largely independent cash flows. Estimates of current cash flows of assets related to hydrocarbon production activities are based on proved reserves, except in circumstances where it is probable that additional resources will be developed and contribute to cash flows in the future.

> United States accounting principles require the disclosure of a standardized measure of discounted future cash flows, relating to proved oil and gas reserve quantities and based on prices and costs at the end of each year, currently enacted tax rates and a 10% discount factor. The information so calculated does not provide a reliable measure of future cash flows from proved reserves, nor does it permit a realistic comparison to be made of one entity and another because the assumptions used cannot reflect the varying circumstances within each entity. In addition, a substantial but unknown proportion of future real cash flows from oil and gas production activities is expected to derive from reserves which have already been discovered, but

17

which cannot yet be regarded as proved.

53.    For fiscal year 1998, Royal Dutch reported that future net cash flows related to proved oil and gas reserve quantities were $59,460,000.  According to annual reports, a 10% percent discount factor or ($28,791,000) was subtracted from the future net cash flows.  As such, Royal Dutch reported that its standardized measure of discounted future cash flows for fiscal year 1998 were $30,669,000.

**Royal Dutch's SEC Form 20-F**
**For the Fiscal Year Ended December 31, 1999**

54.    On April 11, 2000, Royal Dutch filed an annual report with the SEC on Form 20-F.  The Form 20-F stated:

Critical Accounting Policies

**In order to prepare the Financial Statements in conformity with generally accepted accounting principles in the Netherlands and the USA, management has to make estimates and assumptions.** The matters described below are considered to be the most critical in understanding the judgments that are involved in preparing the Financial Statements and the uncertainties that could impact the amounts reported on the results of operations, financial condition and cash flows. Accounting policies are described in Note 2 to the Financial Statements.

Estimation of oil and gas reserves

**Oil and gas reserves have been estimated in accordance with industry standards and SEC regulations. Proved oil and gas reserves are the estimated quantities of crude oil, natural gas and natural gas liquids that geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing economic and operating conditions. These estimates do not include probable or possible reserves. Estimates of oil and gas reserves are inherently imprecise and represent only approximate amounts and are subject to future revision, as they are based on available reservoir data, prices and costs as of the date the estimate is made. Accordingly, the financial measures that are based on proved reserves are also subject to change.** (Emphasis added).

18

55.    Additionally and with respect to reported reserves, Royal Dutch stated:

Supplementary Information — Oil and Gas Reserves

**Proved reserves are the estimated quantities of oil and gas which geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing economic and operating conditions. Proved developed reserves are those reserves which can be expected to be recovered through existing wells with existing equipment and operating methods. The reserves reported exclude volumes attributable to oil and gas discoveries which are not at present considered proved. Such reserves will be included when technical, fiscal and other conditions allow them to be economically developed and produced.**

**Proved reserves are shown net of any quantities of crude oil or natural gas that are expected to be taken by others as royalties in kind but do not exclude certain quantities related to royalties expected to be paid in cash or those related to fixed margin contracts. Proved reserves include certain quantities of crude oil or natural gas which will be produced under arrangements which involve Group companies in upstream risks and rewards but do not transfer title of the product to those companies.  (Emphasis added).**

56.    Moreover, Royal Dutch stated that the Group's proved oil and gas reserves for fiscal year 1999 were 19,869 million barrels.

57.    With respect to future cash flows related to proved oil and gas reserve quantities, a key measure of prospective operating performance based in substantial part on proved oil and gas reserves, the Company's Form 20-F stated:

The carrying amounts of fixed assets are reviewed for possible impairment whenever events or changes in circumstances indicate that the carrying amounts of those assets are written down to fair value.  For this purpose, assets are grouped based on separately identifiable and largely independent cash flows. Estimates of current cash flows of assets related to hydrocarbon production activities are based on proved reserves, except in circumstances where it is probable that additional resources will be developed and contribute to cash flows in the future.

United States accounting principles require the disclosure of a standardized measure of discounted future cash flows, relating to proved oil and gas reserve quantities and based on prices and costs at the end of each year, currently enacted tax rates and a

10% discount factor. The information so calculated does not provide a reliable measure of future cash flows from proved reserves, nor does it permit a realistic comparison to be made of one entity and another because the assumptions used cannot reflect the varying circumstances within each entity. In addition, a substantial but unknown proportion of future real cash flows from oil and gas production activities is expected to derive from reserves which have already been discovered, but which cannot yet be regarded as proved.

58.    For fiscal year 1999, Royal Dutch reported that future net cash flows related to

proved oil and gas reserve quantities were $102,785,000. According to annual reports, a 10%

percent discount factor or ($47,986,000) was subtracted from the future net cash flows. As such,

Royal Dutch reported that its standardized measure of discounted future cash flows for fiscal year

1999 were $54,799,000.

**Royal Dutch's SEC Form 20-F**
**For the Fiscal Year Ended December 31, 2000**

59.    On April 12, 2001, Royal Dutch filed an annual report with the SEC on Form 20-

F. The Form 20-F stated:

Critical Accounting Policies

**In order to prepare the Financial Statements in conformity with generally accepted accounting principles in the Netherlands and the USA, management has to make estimates and assumptions.** The matters described below are considered to be the most critical in understanding the judgments that are involved in preparing the Financial Statements and the uncertainties that could impact the amounts reported on the results of operations, financial condition and cash flows. Accounting policies are described in Note 2 to the Financial Statements.

Estimation of oil and gas reserves

**Oil and gas reserves have been estimated in accordance with industry standards and SEC regulations. Proved oil and gas reserves are the estimated quantities of crude oil, natural gas and natural gas liquids that geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing economic and operating conditions. These estimates do not include probable or possible reserves. Estimates of oil**

and gas reserves are inherently imprecise and represent only approximate amounts and are subject to future revision, as they are based on available reservoir data, prices and costs as of the date the estimate is made. Accordingly, the financial measures that are based on proved reserves are also subject to change. (Emphasis added).

60.     Additionally and with respect to reported reserves, Royal Dutch stated:

Supplementary Information — Oil and Gas Reserves

Proved reserves are the estimated quantities of oil and gas which geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing economic and operating conditions. Proved developed reserves are those reserves which can be expected to be recovered through existing wells with existing equipment and operating methods. The reserves reported exclude volumes attributable to oil and gas discoveries which are not at present considered proved. Such reserves will be included when technical, fiscal and other conditions allow them to be economically developed and produced.

Proved reserves are shown net of any quantities of crude oil or natural gas that are expected to be taken by others as royalties in kind but do not exclude certain quantities related to royalties expected to be paid in cash or those related to fixed margin contracts. Proved reserves include certain quantities of crude oil or natural gas which will be produced under arrangements which involve Group companies in upstream risks and rewards but do not transfer title of the product to those companies. (Emphasis added).

61.     Moreover, Royal Dutch stated that the Group's proved oil and gas reserves was

19,095 million barrels.

62.     With respect to future cash flows related to proved oil and gas reserve quantities, a key measure of prospective operating performance based in substantial part on proved oil and gas reserves, the Company's Form 20-F stated:

The carrying amounts of fixed assets are reviewed for possible impairment whenever events or changes in circumstances indicate that the carrying amounts of those assets are written down to fair value.  For this purpose, assets are grouped based on separately identifiable and largely independent cash flows. Estimates of current cash flows of assets related to hydrocarbon production activities are based on proved

reserves, except in circumstances where it is probable that additional resources will be developed and contribute to cash flows in the future.

United States accounting principles require the disclosure of a standardized measure of discounted future cash flows, relating to proved oil and gas reserve quantities and based on prices and costs at the end of each year, currently enacted tax rates and a 10% discount factor. The information so calculated does not provide a reliable measure of future cash flows from proved reserves, nor does it permit a realistic comparison to be made of one entity and another because the assumptions used cannot reflect the varying circumstances within each entity. In addition, a substantial but unknown proportion of future real cash flows from oil and gas production activities is expected to derive from reserves which have already been discovered, but which cannot yet be regarded as proved.

63.     For fiscal year 2000, Royal Dutch reported that future net cash flows related to proved oil and gas reserve quantities were $114,861,000.  According to annual reports, a 10% percent discount factor or ($51,820,000) was subtracted from the future net cash flows .As such, Royal Dutch reported that its standardized measure of discounted future cash flows for fiscal year 2000 were $63,041,000.

**Royal Dutch's Form 20-F**
**For the Fiscal Year Ended December 31, 2001**

64.     On April 14, 2002, Royal Dutch filed an annual report with the SEC on Form 20-F.  The Form 20-F stated:

Critical Accounting Policies

**In order to prepare the Financial Statements in conformity with generally accepted accounting principles in the Netherlands and the USA, management has to make estimates and assumptions.** The matters described below are considered to be the most critical in understanding the judgments that are involved in preparing the Financial Statements and the uncertainties that could impact the amounts reported on the results of operations, financial condition and cash flows. Accounting policies are described in Note 2 to the Financial Statements.

Estimation of oil and gas reserves

22

**Oil and gas reserves have been estimated in accordance with industry standards and SEC regulations. Proved oil and gas reserves are the estimated quantities of crude oil, natural gas and natural gas liquids that geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing economic and operating conditions. These estimates do not include probable or possible reserves. Estimates of oil and gas reserves are inherently imprecise and represent only approximate amounts and are subject to future revision, as they are based on available reservoir data, prices and costs as of the date the estimate is made. Accordingly, the financial measures that are based on proved reserves are also subject to change.** (Emphasis added).

65.    Additionally and with respect to reported reserves, Royal Dutch stated:

Supplementary Information — Oil and Gas Reserves

**Proved reserves are the estimated quantities of oil and gas which geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing economic and operating conditions. Proved developed reserves are those reserves which can be expected to be recovered through existing wells with existing equipment and operating methods. The reserves reported exclude volumes attributable to oil and gas discoveries which are not at present considered proved. Such reserves will be included when technical, fiscal and other conditions allow them to be economically developed and produced.**

**Proved reserves are shown net of any quantities of crude oil or natural gas that are expected to be taken by others as royalties in kind but do not exclude certain quantities related to royalties expected to be paid in cash or those related to fixed margin contracts. Proved reserves include certain quantities of crude oil or natural gas which will be produced under arrangements which involve Group companies in upstream risks and rewards but do not transfer title of the product to those companies.** (Emphasis added).

66.    Moreover, each stated that proved oil and gas reserves for 2001 were 19,095 million barrels.

67.    With respect to future cash flows related to proved oil and gas reserve quantities, a key measure of prospective operating performance based in substantial part on proved oil and gas reserves, the Company's Form 20-F stated:

23

The carrying amounts of fixed assets are reviewed for possible impairment whenever events or changes in circumstances indicate that the carrying amounts of those assets are written down to fair value. For this purpose, assets are grouped based on separately identifiable and largely independent cash flows. Estimates of current cash flows of assets related to hydrocarbon production activities are based on proved reserves, except in circumstances where it is probable that additional resources will be developed and contribute to cash flows in the future.

United States accounting principles require the disclosure of a standardized measure of discounted future cash flows, relating to proved oil and gas reserve quantities and based on prices and costs at the end of each year, currently enacted tax rates and a 10% discount factor. The information so calculated does not provide a reliable measure of future cash flows from proved reserves, nor does it permit a realistic comparison to be made of one entity and another because the assumptions used cannot reflect the varying circumstances within each entity. In addition, a substantial but unknown proportion of future real cash flows from oil and gas production activities is expected to derive from reserves which have already been discovered, but which cannot yet be regarded as proved.

68.     For fiscal year 2001, Royal Dutch reported that future net cash flows related to proved oil and gas reserve quantities were $86,354,000. According to annual reports, a 10% percent discount factor or ($40,476,000) was subtracted from the future net cash flows. As such, Royal Dutch reported that its standardized measure of discounted future cash flows for fiscal year 2001 were $45,878,000.

**Royal Dutch's SEC Form 20-F**
**For the Fiscal Year Ended December 31, 2002**

69.     On March 31, 2003, Royal Dutch filed an annual report with the SEC on Form 20-F. The Form 20-F stated:

Critical Accounting Policies

**In order to prepare the Financial Statements in conformity with generally accepted accounting principles in the Netherlands and the USA, management has to make estimates and assumptions.** The matters described below are considered to be the most critical in understanding the judgments that are involved in preparing the Financial Statements and the uncertainties that could impact the

24

amounts reported on the results of operations, financial condition and cash flows. Accounting policies are described in Note 2 to the Financial Statements.

Estimation of oil and gas reserves

**Oil and gas reserves have been estimated in accordance with industry standards and SEC regulations. Proved oil and gas reserves are the estimated quantities of crude oil, natural gas and natural gas liquids that geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing economic and operating conditions. These estimates do not include probable or possible reserves. Estimates of oil and gas reserves are inherently imprecise and represent only approximate amounts and are subject to future revision, as they are based on available reservoir data, prices and costs as of the date the estimate is made. Accordingly, the financial measures that are based on proved reserves are also subject to change.** (Emphasis added).

70.    Additionally and with respect to reported reserves, Royal Dutch stated:

Supplementary Information — Oil and Gas Reserves

**Proved reserves are the estimated quantities of oil and gas which geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing economic and operating conditions. Proved developed reserves are those reserves which can be expected to be recovered through existing wells with existing equipment and operating methods. The reserves reported exclude volumes attributable to oil and gas discoveries which are not at present considered proved. Such reserves will be included when technical, fiscal and other conditions allow them to be economically developed and produced.**

**Proved reserves are shown net of any quantities of crude oil or natural gas that are expected to be taken by others as royalties in kind but do not exclude certain quantities related to royalties expected to be paid in cash or those related to fixed margin contracts. Proved reserves include certain quantities of crude oil or natural gas which will be produced under arrangements which involve Group companies in upstream risks and rewards but do not transfer title of the product to those companies.** (Emphasis added).

71.    Moreover, Royal Dutch stated that the Group's proved oil and gas reserves were

19,347 million barrels.

72.    With respect to future cash flows related to proved oil and gas reserve quantities,

a key measure of prospective operating performance based in substantial part on proved oil and

gas reserves, the Company's Form 20-F stated:

> The carrying amounts of fixed assets are reviewed for possible impairment whenever events or changes in circumstances indicate that the carrying amounts of those assets are written down to fair value. For this purpose, assets are grouped based on separately identifiable and largely independent cash flows. Estimates of current cash flows of assets related to hydrocarbon production activities are based on proved reserves, except in circumstances where it is probable that additional resources will be developed and contribute to cash flows in the future.
>
> United States accounting principles require the disclosure of a standardized measure of discounted future cash flows, relating to proved oil and gas reserve quantities and based on prices and costs at the end of each year, currently enacted tax rates and a 10% discount factor. The information so calculated does not provide a reliable measure of future cash flows from proved reserves, nor does it permit a realistic comparison to be made of one entity and another because the assumptions used cannot reflect the varying circumstances within each entity. In addition, a substantial but unknown proportion of future real cash flows from oil and gas production activities is expected to derive from reserves which have already been discovered, but which cannot yet be regarded as proved.

73.    For fiscal year 2002, Royal Dutch reported that future net cash flows related to

proved oil and gas reserve quantities were $123,185,000. According to annual reports, a 10%

percent discount factor or ($57,483,000) was subtracted from the future net cash flows. As such,

Royal Dutch reported that its standardized measure of discounted future cash flows for fiscal year

2002 were $65,702,000.

74.    The statements contained above were each materially false and misleading

because the defendants negligently failed to disclose and/or misrepresented: (1) that Royal Dutch

had overstated its proved oil and gas reserve figures by 20%; (2) that Royal Dutch accomplished

the overstatement by including in its proved oil and gas reserves figures, when its venture

26

partners did not, estimates from the Gorgon Joint Venture in Australia and the Nigerian Projects in Africa when such projects did not meet industry and SEC standards for proved reverses; (3) that the inclusion of Gorgon Joint Venture in Australia and the Nigerian Projects in Africa and other projects was accomplished through the booking of its proved oil and gas reversed figures on the basis of initial letters of intent rather than on the basis of when such projects had been contracted; and (4) as a result, Royal Dutch's true market value was materially overstated at all relevant times.

## THE TRUTH IS REVEALED

75.     On January 9, 2004, Royal Dutch announced that, following internal reviews, some proved hydrocarbon reserves would be recategorized.  The total non-recurring recategorization, relative to the proved reserves as stated at December 31, 2002, represents 3.9 billion barrels of oil equivalent ("BOE") of proved reserves, or 20% of proved reserves at that date.  Over 90% of the total change is a reduction in the proved undeveloped category; the balance is a reduction in the proved developed category.

76.     Additionally, the Company stated that of the recategorization, two thirds (2.7 billion barrels) related to crude oil and natural gas liquids, and one third (1.2 billion BOE or 7.2 trillion standard cubic feet ) to natural gas.  Royal Dutch indicated that the FAS 69 standardized measure of discounted future cash flows associated with the proved reserves will be impacted.

77.     The Company further stated that reserves affected were mainly booked in the period 1996 to 2002 and that a significant proportion of the recategorization related to the current status of project maturity, thereby affecting a number of countries with the largest impact in Nigeria and Australia.  The majority of the overall recategorization would be reported under

27

"Other Eastern Hemisphere."

78.     On news of this, shares of Royal Dutch fell 7.8%, or $4.15 per share, on heavy volume, to close at $48.61 per share on January 9, 2004.

## POST-CLASS PERIOD REVELATIONS

79.     On January 12, 2004, The Wall Street Journal ran an article titled: "Shell Cuts Reserve Estimate 20% As SEC Scrutinizes Oil Industry." In the article, authors, Chip Cummins, Susan Warren, and Michael Schroeder, stated that "Royal Dutch/Shell Group's disclosure that it overstated its proven reserves by 20% rattled energy investors and is raising questions about whether the oil industry has inflated a lifeblood measure of its future prospects." The article quoted Lynn Turner, a former SEC chief accountant, as stating: "[T]he revision, looked like more than a mistake. "A 20% restatement of proven reserves is a humongous error[.] . . . For a company like Shell to have missed its proven reserves by that much is not an oversight. It's an intentional misapplication of the SEC's rules."

80.     With respect to proved reserves, the article stated:

Reserves are at the heart of an oil and gas company because they represent what can be taken from the ground in the future. Since companies must replace the oil and gas they produce each year just to stay even, reserve growth is a crucial indicator of how well a company is doing. If the reserve size falls, the company is less valuable to investors and its stock price will tumble.

81.     On January 14, 2004, The Wall Street Journal ran an article titled: "Shell's Watts Draws Fire, Chairman Criticized Amid Overbooking Flap, Likely SEC Probe." In the article, authors, Chip Cummins and Michael Schroeder, stated:

As the Securities and Exchange Commission looks poised to delve into a huge overbooking of reserves by Royal Dutch/Shell Group, the company's chairman, Philip Watts, has come under increasing fire for his stewardship of one of the world's

28

largest oil producers.

Last week, Shell said it erroneously overbooked reserves by 20%. Reserves are a crucial indicator of an oil company's value. Shares in the group's two holding companies -- Royal Dutch Petroleum Co. of the Netherlands, and Shell Transport & Trading Co. of London -- have fallen sharply since the disclosure Friday.

The unprecedented size of the overstatement makes an SEC investigation likely. "The Shell matter seems significant," said SEC Commissioner Roel Campos. "I am sure our enforcement staff will look into it. It is hard to see how [Shell] could miss so badly."

82.     Additionally, the article stated that:

Analysts and investors have criticized Shell's lackluster performance under Sir Philip against industry peers such as Exxon Mobil Corp., of Irving, Texas, and crosstown rival BP PLC. Sir Philip has cut the company's production-growth estimates. Shell also has performed poorly in recent years against Exxon and BP in finding and developing new prospects, which it needs to replace oil and natural-gas properties depleted by production.

83.     On March 3, 2004, amid pressure from Royal Dutch's shareholders, defendant Watts, as well as Walter van de Vijver, head of Shell 's Exploration & Production operations, were ousted  from the Company.

84.     On March 8, 2004, The Wall Street Journal ran an article titled:  "Former Chairman At Shell Was Told Of Reserve Issues: Memos as Early as 2002 Show Energy Giant's Tally Might Overstate Holdings." In the article, author Chip Cummins stated:

The ousted chairman of Royal Dutch/Shell Group was warned of possible overstatements in the oil titan's petroleum reserves two years before he publicly disclosed them, according to two people familiar with the situation.

**A memo, circulated to Sir Philip Watts and other senior executives in early 2002, warned that the company's method of booking oil and natural-gas reserves appeared to be inconsistent with U.S. Securities and Exchange Commission guidelines, these two people said. The memo pointed out that the company might have to revise downward its reserve tally by the equivalent of about one billion barrels of oil, these people said.**

29

\* \* \*

The boards also found fault with Walter van de Vijver, Shell's head of exploration and production since 2001, who was ousted along with Sir Philip, according to this person. Internal communications in early 2002 and throughout last year indicate Mr. van de Vijver brought the problem to the attention of Sir Philip to come up with ways to correct it, according to people familiar with the matter. "He didn't bring it to the attention of the right people," said one of these people.

The audit committee's findings appear to contradict Shell's assertions that the company acted quickly to disclose problems with its reserve accounting. It is unclear what prompted Shell to act on the warnings late last year and to disclose the problem in January.

Sir Philip previously said Shell "initiated contact" with the SEC on the issue prior to the Jan. 9 disclosure. In a letter to employees on Jan. 16, Sir Philip said: "The scope and timing of our announcement were determined by compliance with regulatory requirements on disclosure. We released the information at the earliest possible time after the recategorized reserves had been quantified with some certainty."

\* \* \*

One document that was part of the internal communications was a memo circulated among senior Shell executives -- including Sir Philip -- in early 2002, say the people familiar with the matter. In it, managers at Shell's exploration-and-production unit warned that Shell's internal guidelines for booking reserves didn't appear to be in line with current SEC guidelines, according to people who have reviewed the document and described it to The Wall Street Journal. It is unclear who drafted the memo.

\* \* \*

Shell's reporting and auditing system appears to have broken down badly. Consider the Gorgon field in western Australia. Shell was a partner there in a project to produce and sell liquefied natural gas. Shell started booking reserves from the project in 1997, even though other large partners, such as ChevronTexaco Corp., never booked any reserves from the project.

The reserve additions from Gorgon wound up in Shell's "revisions" category for new reserves, instead of its "new discoveries" category, in filings with the SEC. Last month, in a day-long presentation explaining the reserve issue, Mr. van de Vijver blamed the mistake on confusion between local reserve reports and company-wide reports. Discoveries classified as "new" generally garner more attention from auditors and investors and could have been challenged more easily internally.

\* \* \*

30

Some Shell executives also had an incentive, albeit a small one, to boost reserves. **Senior Shell managers are awarded year-end bonuses based on a companywide "scorecard" system, which rates Shell's performance on a number of metrics, including financial targets. About 2% of that total performance review relates directly to reserve additions, according to a company spokesman.**

In Shell's February presentation, Sir Philip said reserves had very little to do with the company's bonus scheme. "This is not some kind of big lever for the bonus," he said. "It's just not like that." A company spokesman declined to elaborate.

Though the incentive is small, **it appears to contradict advice given by a senior Shell reserves auditor, Anton Barendregt, in a 2002 industry workshop on reserve accounting. Mr. Barendregt warned fellow petroleum engineers at the time to avoid tying management-performance assessments to reserve additions, "as this might affect the objectivity with which reserves estimates are made,"** according to a summary of his comments provided by the Society of Petroleum Engineers. (Emphasis added).

85.     On March 9, 2004, <u>The New York Times</u> ran an article titled: "Oil Giant's

Officials Knew of Gaps in Reserves in '02." In the article, authors Stephen Labaton and Jeff

Gerth, reported:

The new head of the Royal Dutch/Shell Group and its current chief financial officer, as well as the chairman ousted last week, were advised of huge shortfalls in proven oil and natural gas reserves in 2002, two years before they were publicly disclosed, according to company memorandums and notes of executive discussions.

**But rather than disclose the problems to investors, senior executives in a July 2002 memorandum came up with — and later carried out — what the memorandum described as an "external storyline" and "investor relations script" that tried to "highlight major projects fueling growth," "stress the strength" of existing resources, and minimize the significance of reserves as a measure of growth.**

Problems with reserves were discussed among senior executives months earlier.

**A February 2002 memorandum said that one billion barrels of reserves "are no longer fully aligned" with Securities and Exchange Commission rules because the agency issued an interpretation of them.** The memorandum said that an additional 1.3 billion barrels of reserves were at risk because it was no longer certain that they could be extracted during the remaining term of licenses between the company and three foreign countries.

\* \* \*

**The company documents, which The New York Times and lawyers investigating the company have copies of, suggest that current and former senior executives had known about significant problems with reserves since at least 2002 and they raise questions about whether the company moved swiftly to correct the problem.** The company's accounting of reserves is now under investigation by the S.E.C.

The July 2002 memorandum described licensing and other reserve problems in detail.

"Shell faces a challenge" in maintaining its proven reserves "over the coming years — particularly during 2002 and 2003" and simultaneously achieving production growth and keeping expenses down, the July 18 memorandum begins. It said technical and commercial constraints "equates to a shortfall of 2-3 billion" barrels of proven reserves, which are oil and gas resources that are reasonably certain to be produced.

The documents show that beginning late last summer, the company grew increasingly concerned about the reserves issue after audit reports of some reserves, a tougher accounting interpretation by the S.E.C. and passage in 2002 of the Sarbanes-Oxley Act, which imposes additional obligations on executives and audit committees. Company executives were also focused on an inquiry about reserves at several companies operating in the Gulf of Mexico, including Shell, that the S.E.C. began in October 2002.

\* \* \*

The February memorandum indicated that the shortfall in reserves could pose significant competitive problems.

"Our reserves replacement performance over the past few years clearly illustrates the emerging problems with our resource base and is becoming a source of competitive disadvantage," the memorandum said.

But the company did not appear seriously to consider whether to revise its reserve figures until last August. Mr. van de Vijver, then head of exploration and production, sent a memorandum to the audit committee explaining a host of reserve issues. On the cover page of the memorandum, an unidentified executive scrawled a note.

"Potential exposure," the note reads. "Some look like they should be debooked."

Over the last two years, Sir Philip repeatedly minimized the reserve problems and stressed the company had been quick in addressing and disclosing them.

In August 2002, a few weeks after the July memorandum, he was asked in an analyst conference call about reports about reserve problems in Oman.

"There have been reports in Oman," he replied. "Sometimes you get a bit of hiccup, but I have no doubt that people are getting on top of that and that we will see a pretty good future."

The July 2002 memorandum that talked about the "investor relations script" suggested building on existing positive messages "already delivered externally."

Last month, after revising the reserve figures, Sir Philip said the company had moved swiftly.

"This thing came up late last year," Sir Philip said in a conference call with analysts. "As soon as that came to my attention, it was a matter of all hands on deck, and I remember writing down the words 'get the facts and do the right thing,' because we had a duty to disclose as soon as it was possible." (Emphasis added).

86.     On March 18, <u>The Wall Street Journal</u> ran an article titled: "Shell Cuts Reserves Again,

Postpones Annual Report." In the article, author Chip Cummins reported:

> **Royal Dutch/Shell Group Thursday cut its estimate of its energy reserves for a second time and said it would postpone the publication of its annual report until it had further scrutinized holdings in its global oil and natural-gas portfolios.**
>
> **The surprise disclosure brings to 21% the amount by which Shell has slashed its reserves. It stunned investors and analysts, who had been looking forward to Shell's scheduled release of its annual report Friday to provide some clarity about the reserve debacle and some assurances that management had started to put the problem behind it.**
>
> Instead, the six-page release raised new questions, including worries about whether Shell had further bad news to disclose on a conference call scheduled for 2 p.m. GMT Thursday.
>
> * * *
>
> Shell, the world's third-largest oil company by market capitalization, also said it wouldn't re-book as planned a large chunk of reserves that it had cut from its tally. In early January, Shell cut its reserves by 3.9 billion barrels of oil equivalent, or 20%. But executives said early last month that it would re-book some of those cuts.

33

Shell said Thursday that further concerns arose about its reserves as it was finalizing its 2003 end-of-year numbers. As a result, the company hired Ryder Scott Co., an independent reserve consultant, to conduct reviews of about 40% of Shell's oil and gas fields.

Shell said Thursday that it will cut a further 250 million barrels of oil equivalent from its reserve tally, on top of the 3.9-billion-barrel cut earlier this year. The company said it was also reducing the amount of reserves it planned to re-book as part of its 2003 year-end tally by 220 million barrels of oil equivalent.

The new reductions include gas associated with a large project at Ormen Lange in northern Norway. Shell had said in February that it prematurely booked Ormen Lange reserves but planned to include them in the company's 2003 figures. In its statement Thursday, Shell reversed itself.

**The 220-million-barrel reduction will cut Shell's 2003 reserve replacement ratio -- an important indicator of an oil company's performance -- to 82% from 98%.**

The company also said it was the subject of an insider-trading investigation by the Autoriteit Financiele Markten, or AFM, a Dutch financial regulator. Other regulators, including the U.S. Securities and Exchange Commission, Britain's top financial regulator and Euronext, the European stock exchange, also are investigating Shell's reserve restatement.

\* \* \*

The reserve cuts indirectly affect the company's bottom line through accounting for depreciation. In February, the company said its original reserve cut would result in an after-tax depreciation charge of $86 million. The new cuts will add charges of $20 million, and Shell said an additional $10 million in write-offs had been identified as a result of the reserve downgrades.

The charges are insignificant compared to Shell's net income last year of $12.7 billion, but the company also said that it would make unspecified amendments to parts of its 2002 annual report and related SEC filings.

The changes -- which Shell said were recommended by SEC staff currently investigating the reserve downgrades - will affect Shell's "discussion and analysis of financial conditions and results of operations" -- where companies typically make important disclosures to investors about corporate finances, Shell's statement said. "Some disclosures will be increased," the statement said. (Emphasis added).

87.     Also on March 18, The Wall Street Journal ran an article entitled, "Shell Eased

Rules in Mid-1990s On Accounting for Energy Reserves." In the article, authors Chip Cummins

and Alexei Barrionuevo reported:

**Royal Dutch/Shell Group's guidelines on accounting for natural-gas reserves were relaxed as early as the mid-1990s, a move that appears to have played a role in Shell's overstatement of its energy holdings.**

**The loosening, as described by a former Shell executive, suggests that at least some of Shell's problems in accounting for its reserves may have predated the arrival of Philip Watts, the recently deposed chairman who headed Shell's exploration and production unit from 1997 to 2001. But the change in Shell's rules doesn't explain why significant natural-gas reserves booked on Sir Philip's watch weren't removed from the company's tally once they were tightened again at the end of 2001.**

The change appears to have led Shell to overstate or prematurely book reserves in two big natural-gas fields in Australia and Norway. In particular, Shell's actions involving an icy natural-gas field off the coast of Norway show the energy giant could be much more aggressive than its partners in booking reserves, a measure of oil and natural-gas holdings closely watched by investors.

It is unclear why the guidelines were relaxed so significantly, though at the time Shell was facing intense pressure from investors and analysts to keep up with peers in finding new reserves of crude oil and natural gas. It is also unclear if other guidelines -- for booking crude-oil reserves, for instance -- were similarly relaxed. U.S. accounting guidelines require only "reasonable certainty" from companies in accounting for reserves, giving them leeway in making their own geological and financial assumptions.

* * *

Sir Philip, ousted as chairman by Shell's twin boards this month, led the exploration and production unit when much of the overbooking occurred. Shell's boards also removed Walter van de Vijver, who succeeded Sir Philip as head of exploration.

* * *

Proved reserves, or hydrocarbons that a company expects to commercially extract, are included each year in filings with the SEC. In the early 1990s, Shell's own reserve-booking guidelines, contained in a two-volume document updated each year, allowed executives to book proved natural-gas reserves only if Shell had signed a sales contract for the gas.

In the mid-1990s, however, Shell loosened the rules to allow gas-reserve bookings with only a "reasonable expectation" of an available market, according to a former

Shell executive.

Shell guidelines were amended again at the end of 2001 to warn that gas from "major" projects shouldn't be booked as reserves until agreements had been signed concerning Shell's commitment to invest money in the project, according to the former Shell executive.

At the Gorgon field in northwestern Australia, Shell began booking gas reserves in 1997, even though a final investment decision at Shell isn't expected until next year. The Gorgon reserves, which ultimately totaled some 557 million barrels of oil equivalent, weren't taken off the books until Shell's January overstatement disclosure.

Though Gorgon has attracted the attention of analysts and industry consultants, Shell's lesser-known reserve mistakes at Ormen Lange, an offshore gas field in northern Norway, underscore how different Shell's booking standards were from those of many of its peers. Shell began booking reserves at the Norwegian field years before Shell and its partner companies at the site worked out difficult technical and marketing hurdles on the project.

In 1999, just two years after the field was found, Shell started booking gas reserves that eventually grew to some 109 million barrels of oil equivalent. The company said in a daylong presentation early last month that it erred in the booking.

Partners Norsk Hydro ASA, Statoil ASA, BP PLC and Exxon Mobil Corp. all held off booking reserves at Ormen Lange until just a few months ago, only after all of the risks had been thoroughly vetted, according to officials at those companies.

When Shell booked Ormen Lange reserves in 1999, the consortium partners had drilled just two exploration wells and done some preliminary feasibility studies, said Thor Tangen, senior vice president with Norsk Hydro and the project's director until this past January.

Shell and its partners struggled with the tremendous technical challenges of drilling a field in the deep Norwegian waters. Subzero temperatures could freeze pipes at the site, where 8,000 years ago a giant "submarine slide" had dumped sediment equivalent in mass to Iceland on the sea floor, according to studies reviewed by Norsk Hydro. The slide caused a tsunami that spread debris across the seabed as far as England and wiped out many of the early settlers of Norway's western coast.

The partners were so concerned that the project might trigger another disaster that they conducted a $100 million study to establish its safety, according to project managers at Norsk Hydro. That study, begun in early 2000, wasn't completed until

36

mid-2003. It found the project safe, allowing it to proceed.

But until last year, partners were still struggling to determine whether European markets could absorb the supply of natural gas from the field. Market-related concerns caused the partners in 2001 to move the projected date for first gas flow to late 2007 from 2006. The consortium completed an investment plan only in December, after the British and Norwegian governments approved a 747-mile sub-sea pipeline -- the world's longest -- to export gas from Norway to the eastern coast of England.

In the early-February reserves presentation, Mr. van de Vijver said the early bookings at Ormen Lange were attributable to Shell being "optimistic about the quality of the source and the demand in the market," according to a transcript provided by CCBN StreetEvents.

He said Shell made a final investment decision in December and, therefore, planned to rebook the Ormen Lange reserves. The Shell spokesman reiterated that the company still expects to rebook Ormen Lange's natural-gas reserves. (Emphasis added).

## DEFENDANTS VIOLATION OF GAAP RULES

88.     Given these accounting irregularities described above, the Company announced

discounted cash flows and proved reserves were in violation of GAAP, and the following

principles:

(a)     The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" was violated (APB No. 28, ¶10);

(b)     The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" was violated (FASB Statement of Concepts No. 1, ¶34);

(c)     The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change those resources and claims to those resources" was violated (FASB Statement of Concepts No. 1, ¶40);

(d)     The principle that "financial reporting should provide information about an

37

enterprise's financial performance during a period" was violated (FASB Statement of Concepts No. 1, ¶42);

(e)     The principle that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" was violated (FASB Statement of Concepts No. 2, ¶79);

(f)     The principle that "financial reporting should be reliable in that it represents what it purports to represent" was violated (FASB Statement of Concepts No. 2, ¶¶58-59); and

(g)     The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" was violated. (FASB Statement of Concepts No. 2, ¶95).

89.     The adverse information concealed by defendants during the Class Period and detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. 229.303).

## DEFENDANTS' VIOLATION OF INDUSTRY AND SEC RULES

90.     The Society of Petroleum Engineers ("SPE"), an independent professional society, has determined the classification of reserves. The SPE has established industry standard guidelines for accounting for reserves. According SPE, these classifications are a key factor in determining the value of the reserves, and reserves are classified as either "proved" or "unproved."

91.     According to the SPE, proved reserves:

can be estimated with reasonable certainty to be recoverable under current economic conditions. Current economic conditions include prices and costs prevailing at the time of the estimate. Proved reserves may be developed or undeveloped . . . [Proved reserves] must have facilities to process and transport those reserves to market that are operational at the time of the estimate, or there is a commitment or reasonable expectations to install such facilities in the future.

92.     With respect to guidance by the SEC, the definition for proved oil and gas

reserves can be found in Rule 4-10(a) of Regulation S-X of the Securities Exchange Act of 1934,

which states:

> Proved oil and gas reserves. Proved oil and gas reserves are the estimated quantities
> of crude oil, natural gas, and natural gas liquids which geological and engineering
> data demonstrate with reasonable certainty to be recoverable in future years from
> known reservoirs under existing economic and operating conditions, i.e., prices and
> costs as of the date the estimate is made. Prices include consideration of changes in
> existing prices provided only by contractual arrangements, but not on escalations
> based upon future conditions. See also FAS 25, Suspension of Certain Accounting
> Requirements for Oil and Gas Producing Entities ¶34 (Feb. 1979).

93.     Moreover, the SEC states: "The concept of reasonable certainty implies that, as

more technical data becomes available, a positive, or upward, revision is much more likely than a

negative, or downward, revision. " SEC Div. of Corp. Fin: Frequently Requested Accounting and

Fin. Reporting Interpretations and Guidance ("SEC Guidance") (Mar. 31, 2001).

94.     Royal Dutch's overstatement of its proved reserves by 20% is in clear violation of

the above-referenced principles.  More specifically, Royal Dutch violated both SPE and SEC

rules by including, in its proved reserves figures, the Gorgon Joint Venture in Australia and the

Nigerian Projects in Africa when such projects neither meet industry nor SEC standards for

proved reverses and when its venture partners did not include such amounts in its calculations of

its proved oil and gas reserves.

## DEFENDANTS' BREACH OF FIDUCIARY DUTIES CAUSED THE LOSS

95.     The Plan, and the Participants acting on behalf of the Plan, relied upon, and are

presumed to have relied upon, defendants' misrepresentations and nondisclosures to their

detriment.

96.    As a consequence of defendants' misrepresentations and nondisclosures, the Plan suffered losses.

97.    Defendants are personally liable to make good to the Plan any losses to the Plan resulting from each breach.

98.    Each defendant is jointly liable for the acts of the other defendants as a co-fiduciary.

99.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should award equitable relief.

## CLAIM II

## ROYAL DUTCH STOCK WAS AN IMPRUDENT INVESTMENT

100.    The allegations of all paragraphs set forth above are specifically realleged and incorporated herein by reference.

101.    Defendants failed to shift liability to Participants for imprudent investment decisions under section 404(c), so defendants remained liable for all imprudent investments in Royal Dutch stock offered in the Plan.

102.    Defendants breached their fiduciary duties as alleged above by allowing the Plan to purchase and hold Royal Dutch stock during the Class Period, and by allowing the Royal Dutch stock to remain an investment option under the Plan, because this investment in Royal Dutch stock was an imprudent investment for Plan whose purpose was to provide for employee retirement income security.

103.    At all relevant times, defendants were aware or should have been aware of the publicly disclosed misrepresentations, which knowledge would have led a reasonable investment

manager to conclude that an investment in Royal Dutch stock was an imprudent, high risk investment for the Participants in the Plan, whose purpose was to provide for employee retirement income security. In particular, defendants should have known that; (a) Royal Dutch substantially overstated oil and gas reserves and permitted other accounting irregularities arising out of its joint partnership with Shell Transport and Trading Company, PLC from a project off the western coast of Australia called the Gorgon Joint Venture, and various projects in Nigeria; (b) Royal Dutch classified and reported, in SEC filings and other public documents, certain reserves as "proved reserves" when, unbeknownst to Plan Participants, the reserves did not meet SEC and industry requirements necessary to be classified as "proved," and were improperly reported as proved reserves in Royal Dutch's financial reports, thereby materially artificially inflating a key measure of the companies' financial position and competitive standing; and (c) Royal Dutch was forced to write-down its proved oil and gas reserves by 20%, or 3.9 billion barrels, from 19.5 billion barrels to 15.6 billion barrels. These facts demonstrate that investment in Royal Dutch stock was not a prudent investment.

104.    Defendants also have known (a) that defendants made the negligent misrepresentations directly to Plan Participants as set forth above; (b) these facts that were negligently never disclosed in a timely manner; and (c) that these negligent misrepresentations and nondisclosures would have a negative effect on the price of the Royal Dutch stock and caused the stock to be an imprudent investment.

105.    Based on the foregoing, defendants should have terminated the Royal Dutch stock as an investment option.

106.    To the extent that the defendants possessed material adverse nonpublic

41

information, they should have prevented the Participants from purchasing additional Royal Dutch stock. They should also have directed the Plan to sell all Royal Dutch stock and disclosed this nonpublic information prior to any sales by the Plan.  Had it done so, the Plan would have limited their losses substantially, even though the price might have dropped upon disclosure.

## DEFENDANTS' BREACH OF FIDUCIARY DUTY CAUSED THE LOSS

107.    Defendants were fiduciaries who breached their fiduciary duties in that they should have known the facts as alleged above and should have known that the Plan should not have permitted the investment in Royal Dutch stock.

108.    As a consequence of the defendants' breaches, the Participants suffered losses.

109.    The defendants are liable to personally make good to the Participant any losses to the Plan resulting from each breach.

110.    Each defendant is jointly liable for the acts of the other defendants as a co-fiduciary.

111.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should award equitable relief to the Class.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for:

A.    A declaration that the defendants, and each of them, have breached their ERISA fiduciary duties to the Participants;

B.    A declaration that the defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

42

C.      An order compelling the defendants to make good to the Plan all losses to the Plan resulting from defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan's all profits the defendants made through use of the Plan's assets, and to restore to the Plan all profits which the Participants would have made if the defendants had fulfilled their fiduciary obligations;

D.      Imposition a constructive trust on any amounts by which any defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.      An order enjoining defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the Participants' individual accounts in proportion to the accounts' losses;

G.      An order that Defendants allocate the Plan's recoveries to the accounts of all Participants who had any portion of their account balances invested in Royal Dutch stock maintained by the Plan in proportion to the accounts' losses attributable to the decline in the stock price of Royal Dutch;

H.      An order awarding costs pursuant to 29 U.S.C. § 1132(g);

I.      An order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.      An order for equitable restitution and other appropriate equitable monetary relief against the defendants.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: March 25, 2004

**LITE, DEPALMA, GREENBERG & RIVAS, LLC**

By: _Joseph J. DePalma (KB)_

Joseph J. DePalma, Esq. (7697)
Katrina Blumenkrants (KB-9620)
Two Gateway Center, 12th Floor
Newark, New Jersey 07102
Telephone (973) 623-3000
Facsimile  (973) 623-0858

**WECHSLER HARWOOD LLP**
Robert I. Harwood, Esq.
Jeffrey M. Norton, Esq.
488 Madison Avenue, 8th Floor
New York, New York  10022
Telephone: (212) 935-7400
Facsimile: (212) 753-3630

**Attorneys for Plaintiffs**

**OF COUNSEL:**

**LAW OFFICES OF CHARLES J. PIVEN, P.A.**
Charles J. Piven, Esq.
401 East Pratt Street, Suite 2525
Baltimore, Maryland 21202
Telephone:     (410) 332-0030
Facsimile:     (410) 685-1300

44

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

Plaintiff, by his attorneys, hereby certifies that to the best of his knowledge, the matter in controversy is related to <u>Joseph Cohen, et al. v. N.V. Koninklijke Nederlandsche Petroleum Maatschappij</u>, filed on January 23, 2004; <u>John Brockamp v. N.V. Koninklijke Nederlandsche Petroleum Maatschappij, et al.</u>, Civil Action No. 04-374 (JWB); <u>Paul Engel v. N.V. Koninklijke Nederlandsche Petroleum Maatschappij</u>, Civil Action No. 04-430; (JWB); <u>George Alala v. N.V. Koninklijke Nederlandsche Petroleum Maatschappij a/k/a Royal Dutch Petroleum Company, et als.</u>, Civil Action No.: 04-717 (JWB); <u>Anthony Lazorko v. N.V. Koninklijke Nederlandsche Petroleum Maatschappij a/k/a Royal Dutch Petroleum Company, et als.</u>; Civil Action No.: 04-894 (JWB); <u>William Sinnreich v. N.V. Koninklijke Nederlandsche Petroleum Maatschappij a/k/a Royal Dutch Petroleum Company, et als.</u>, filed on March 24, 2004; <u>David Noboa v. N.V. Koninklijke Nederlandsche Petroleum Maatschappij a/k/a Royal Dutch Petroleum Company, et als.</u>, filed on March 24, 2004.

Plaintiff is not currently aware of any other party who should be joined in this action.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are wilfully false, I am subject to punishment.

Dated: March 25, 2004

**LITE DePALMA GREENBERG & RIVAS, LLC**

By: _Joseph J. DePalma (KB)_

Joseph J. DePalma (JD-7697)
Katrina Blumenkrants (KB-9620)
Two Gateway Center, 12th Floor
Newark, New Jersey 07102
(973) 623-3000

**Attorneys for Plaintiff**